Cockburn and another vs. The Ashland Lumber Co.

COCKBURN and another vs. THE ASHLAND LUMBER COMPANY.

*March 16 — April 5, 1882.*

*Executory contract for sale of goods: Measure of damages for a breach on vendor's part: Evidence.*

54   619
76   623
54   619
92   218

54       619
114    ¹420
114    ³420
52 LRA 216n
52 LRA 217n
52 LRA 219n
52 LRA 223n
57 LRA 193n
57 LRA 200n
57 LRA 203n
57 LRA 206n

1. In an action for the breach of an executory contract to sell and deliver goods, the measure of damages generally is, the difference between the contract price and the market price of the goods at the time and place of delivery specified in the contract. But this rule is inapplicable where the purchaser could not go into the market at the agreed time and place for delivery, and obtain the goods.

2. The contract in this case requiring delivery of certain kinds of lumber in large quantities, by the defendant company to the plaintiffs, on defendant's docks at Ashland in this state at specified times, the court erred in admitting evidence for the defendant to show that plaintiffs could have procured the lumber to be manufactured at some of the mills on the Wisconsin Central Railway between Ashland and Stevens Point — there being no evidence that plaintiffs had notice beforehand of defendant's intended default, or that *after such default* they could have procured at such mills lumber of the required kinds, and placed it in Ashland ready for shipment at the times and in the manner required by the contract. What the rule would be if they had had such notice, and could thus have supplied themselves, not considered.

3. Plaintiffs in this case are entitled to recover such damages as did arise and would naturally arise according to the usual course of things, from defendant's breach of contract, or such as may reasonably be supposed to have been in the contemplation of both parties when they made the contract, as the probable result of such a breach of it, but not such as arose from special circumstances under which plaintiffs entered into the contract, unknown to the defendant at that time.

4. Thus, plaintiffs were entitled to show that the lumber purchased was intended for shipment to Q., and that this was known to defendant at the date of the contract; and thereupon their damages would be ascertained by adding to the contract price of the lumber at the agreed time and place of delivery, the cost of transporting it to Q. (including insurance), and the fees of inspection, and any other expenses usual and necessary in putting the lumber upon the market at Q., and deducting this amount from the market price at Q. at the time when it would have reached that place if there had been no breach of the contract.

APPEAL from the Circuit Court for *Eau Claire* County. The action was to recover damages for the entire failure of the defendant to fulfill a contract in writing entered into by the parties for the sale and purchase of two cargoes of a kind of lumber known as "deals." The contract was as follows:

"It is this day, the 5th day of February, 1878, mutually agreed between the *Ashland Lumber Company*, of Ashland, Wisconsin, and *McRae & Cockburn*, of Loudvie and Toronto Canada, that the first-named parties sell, and the second-named parties purchase, two cargoes of white pine deals, each cargo to be of about 300,000 feet, board measure, and to be of the following specification of qualities and sizes, and not less than seventy-five per cent. first quality and not more than twenty-five per cent. second quality, all three inches thick; eighty-five per cent. twelve feet long; five per cent. eight to ten feet long; principally ten feet; ten per cent. thirteen to twenty feet long; principally sixteen feet; ninety per cent. eleven inches and up wide; ten per cent. seven to ten inches wide. The whole to average not less than $14\frac{1}{2}$ inches wide. All to be well manufactured and square butted, and culled in accordance to the Quebec custom of culling such qualities and sizes, and by a qualified culler appointed by purchasers. Sellers to pile the said deals on their docks and property in Ashland, two or three cross-pieces of dry seasoned slats between each layer or row of deals, and sufficient space between each deal of each row (to the approval of purchasers) so as to admit of a free current of air between each deal.

"One cargo to be ready for shipment on or before the 1st of July next; second cargo to be ready for shipment on or before the 20th of July next; seller delivering each cargo on rail of schooner sent by purchasers for them, and as fast as required by master of the vessels; it being understood purchasers are to send the vessels within thirty days after the respective dates mentioned above for delivering of each cargo. Purchasers to pay for said deals at the rate of $18, American currency, per

Cockburn and another vs. The Ashland Lumber Co.

1,000 feet, board measure, for the first quality, and at the rate of $10, American currency, for 1,000 feet, board measure, for the second quality, when shipped on board the schooner at Ashland, Wisconsin. Purchasers agree to make sellers advances on the foregoing contract to the extent of $3,000, by purchasers' acceptance of C. Stadely's drafts, say one draft payable the 10th of March next for $1,000; one draft payable the 10th of April next for $1,000; one draft payable the 10th of May next for $1,000,— sellers paying purchasers interest on such advances at the rate of ten per cent. per annum from date of maturity to shipment of cargoes.

"Dated and signed in Ashland, Wisconsin, this 5th day of February, 1878."

Judgment is demanded for $6,109.61. The plaintiffs had a verdict for $50. They moved for a new trial, and appealed from an order denying the motion. The case is further stated in the opinion.

For the appellants there was a brief by *J. J. Miles*, their attorney, with *J. M. Bingham*, of counsel, and oral argument by *Mr. Bingham*.

For the respondent there was a brief signed by *L. M. Vilas*, of counsel, with *John H. Knight* and *W. M. Tompkins*, its attorneys, and oral argument by *Mr. Vilas:*

1. It is well settled that the ordinary measure of damages recoverable for the failure of the vendor in such a contract, is the difference between the contract price and the actual market value of the chattels at the time when and place where they should have been delivered. 1 Sedgw. on Dam. (7th ed.), 552 and note; Benjamin on Sales, sec. 870; *Richardson v. Chynoweth*, 26 Wis., 656; *Chapman v. Ingram*, 30 id., 290; *Gregory v. McDowel*, 8 Wend., 434; *Dana v. Fiedler*, 2 Kern., 40; *Cahen v. Platt*, 69 N. Y., 348. Nor does it seem that this established rule should be varied or qualified by the determination of the fact whether, at the time of the breach, there may be for sale in the market a sufficient quantity of the

chattels contracted for to enable the vendee to immediately supply himself. If a market price be proven at the place of delivery specified in the broken contract, that price must control in estimating the damages, without regard to the supply in the market at the time. *Jemmison v. Gray*, 29 Iowa, 537; *Richardson v. Chynoweth, supra*. If no market price can be readily or clearly shown at the place of delivery in the contract, evidence may be given of the market value at other places in the vicinity, for the purpose only, however, of approximately ascertaining and fixing the market value of the articles at the place where they should have been delivered, and not to substitute as a measure of damages the value at such other places. *Berry v. Dwinel*, 44 Maine, 255; *Young v. Lloyd*, 65 Pa. St., 199; *Wemple v. Stewart*, 22 Barb., 154; *Cahen v. Platt, supra*. The instructions given by the court were in harmony with these principles. The instruction asked by plaintiffs, and refused, was not; and it also entirely ignored the risk and perils of navigation, for which a great deduction must always be made, whenever a distant and foreign market is resorted to for evidence in ascertaining such damages. *Harris v. Panama R. R. Co.*, 58 N. Y., 660. 2. The loss of profits on the contract for resale was not in contemplation of the parties at the time when their contract was made, and was not the natural and direct result of defendant's breach of contract, and hence not recoverable in this action. The allegations in the complaint in regard thereto were properly stricken out, for the reason that they were insufficient, if proven, to permit a recovery of the lost profits. The evidence offered was neither admissible under the complaint as it was originally served, nor as it stood at the time of trial, since such evidence was not sufficient to warrant the claim to recover such profits as a part of appellant's general damages for the breach of contract. *Hadley v. Baxendale*, 9 Exch., 341; *Harvey v. R. R. Co.*, 124 Mass., 421; Benjamin on Sales, sec. 870; *Parsons v. Sutton*, 66 N. Y., 92;

*Laird v. Townsend*, 5 Hun, 107.   3. The evidence to show a nearer and cheaper market for deals than Quebec was better, fairer and more competent evidence of value, in estimating the damages, than the value at Quebec.   If it established such a market, the value at Quebec could not be considered by the jury.   *Grand Tower Co. v. Phillips*, 23 Wall., 471.   To justify a reference to a distant market, there must really be no other.   *Coxe v. England*, 65 Pa. St., 212.

LYON, J.   It is conceded that none of the lumber contracted for was ever delivered by the defendant company, and it is not claimed that the plaintiffs made any default in the performance of the contract on their part.   The plaintiffs are therefore entitled to recover in the action, and the only matter to be determined on this appeal is the rule of damages.   The general rule in actions to recover damages for the breach of an executory contract to sell and deliver goods, is that the difference between the market price of the goods at the time and place specified in the contract for delivering the same, and the contract price, is the measure of damages.   The basis of this rule is, that on failure of the vendor to deliver the purchaser may go into the market at the time and place of delivery, and supply himself with the same kind of goods at the market price.   Hence, the difference between what he is compelled to pay for the goods, and what they would have cost him had the vendor performed his contract, justly measures the damages which he has sustained by the breach of the contract.   But this rule presupposes that the purchasers may go into the market at the agreed time and place of delivery and obtain the goods.   If no such goods can then be obtained at that place, there can be no market price there by which to measure the purchasers' damages.   The idea that there can be a real, substantial market price for a given commodity, when there is no such commodity for sale in the market, is absurd.   If, therefore, there were no deals for sale in the Ashland market from July 1 to

20, 1878 — the times of delivery specified in the contract,— of the grades and dimension therein specified, we must find some other rule by which to measure the plaintiffs' damages.

Testimony was given on behalf of the defendant that there was a market price for deals of the grades specified in the contract at Ashland and Bayfield, and that the same price obtained in Ontonagon and Hancock — the former place being 100 and the latter 120 miles distant from Ashland. We need not stop to inquire how the plaintiffs would be affected thereby could they have purchased a like quantity, quality and description of deals in those markets in July, 1878, because there is really no evidence that they could have procured the same in either or all of them. The evidence is conclusive that they could not have supplied themselves in the markets of Ashland or Bayfield. As to Ontonagon, the only testimony is that there were 3,000,000 feet of logs there in 1878, which would make twenty-five per cent. of deals of the quality specified in the contract. There is no evidence that any deals were cut or that they could have been procured at that place during that year. There is evidence to the effect that 600,000 or 700,000 feet were manufactured at Hancock in 1878. The grade or dimensions of the Hancock deals, or the time when manufactured, does not appear. It does appear, however, that the same were manufactured for Chicago parties. The evidence would not support a finding or verdict that deals were kept in stock for general sale at any of these places, or at any place in the Lake Superior region. All of the proofs tend to show that this kind of lumber is usually manufactured to fill special contracts therefor. It is not claimed that the defendant company informed the plaintiffs they could obtain the deals elsewhere; and the managing owner of the company testified that the company could not have purchased the same. If it could not, it is difficult to understand how or where the plaintiffs could do so.

We conclude that the evidence fails entirely to show that

the plaintiffs could have purchased any deals like those specified in the contract, at any of the places before mentioned, in July, 1878, and hence that there was no market price for such deals at any of those places; or, at most, but a merely nominal market price, which furnishes no basis for ascertaining the plaintiffs' damages.

The learned circuit judge submitted the question to the jury whether there was a market price at Ashland, or in that vicinity, for such deals as the contract called for, at the time the same were agreed to be delivered, and whether the plaintiffs could have then purchased the same in the Ashland market, or in that vicinity. There being no sufficient evidence to support an affirmative finding on that question, it was error to submit it to the jury. *Spaulding v. C. & N. W. Railway Co.*, 33 Wis., 582, and cases cited; *Read v. Morse*, 34 Wis., 315.

The court admitted testimony tending to show that the plaintiffs could have procured the deals to be manufactured at some of the mills on the Wisconsin Central Railway between Ashland and Stevens Point. We think the testimony should have been rejected. We find no proof that the plaintiffs had any notice that the defendant company would not perform its contract, until it made default; that is, until July 1, 1878. There is no proof whatever that the plaintiffs, after that time, could have supplied themselves with deals at those mills of the grades and dimensions specified in the contract, and placed the same in Ashland, piled for shipment, at the times and in the manner required by the contract.

Until they had notice to the contrary, the plaintiffs might well rely on their contract with the defendant to obtain the deals; and, before the defendant can be allowed to show that deals might have been obtained by the plaintiffs at the mills on the railway, it must show not only that deals of the grades and dimensions specified in the contract could have been thus obtained, but that the plaintiffs had sufficient time after notice

that the defendant would not deliver the deals, and before July 1st and July 20th, respectively, to purchase the same at the mills and place them in Ashland (or at some equally accessible point on Lake Superior) for shipment, piled in the manner specified in the contract. Had it been made to appear that the plaintiffs had notice in due time that the defendant would not perform its contract, so that they could have contracted with mill-owners along the line of the railway for the deals, and could have had them ready at Ashland for shipment in the condition and at the times called for by their contract with the defendant, we should have a case presenting questions not in the present case, and which will not be here determined.

What, then, is the rule of damages in a case like this? In the leading case of *Hadley v. Baxendale*, 9 Exch., 341 *(S. C.*, 26 Eng. Law & Eq., 398), the doctrine of which has been adopted by this and many other courts, the rule applicable to this case was thus stated by Baron ALDERSON: " Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i. e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most,

could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract. For, had the special circumstances been known, the parties might have specially provided for the breach of contract by special terms as to the damages in that case, and of this advantage it would be very unjust to deprive them."

Among the cases in this court in which the rule of *Hadley v. Baxendale* has been approved and applied, are the following: *Shepard v. Mil. Gas Light Co.*, 15 Wis., 318; *Richardson v. Chynoweth*, 26 Wis., 656; *Chapman v. Ingram*, 30 Wis., 290. See also *Ingram v. Rankin*, 47 Wis., 406. Many of the adjudications in other courts upholding the rule of *Hadley v. Baxendale* are cited and commented upon in the opinions in the above cases. It is unnecessary further to refer to them here. A very learned and elaborate note, in which a large number of cases, both English and American, bearing upon and approving the different branches of the above rule are collated, will be found in 1 Sedg. Dam. (7th ed.), 218.

The amended complaint contained allegations that plaintiffs purchased the deals for resale at Quebec; that they had in fact contracted to sell them to parties there in October preceding at a stipulated price largely in advance of the price which they agreed to pay the defendant therefor; and that they notified the defendant on July 8, 1878, that they had so contracted for a resale of the deals. This portion of the complaint was stricken out by the court on motion of the defendant. This ruling was correct. To bind the defendant by the price stipulated for on a resale, he must have had notice of such resale when the contract was made, though, perhaps, not of the contract price. In the absence of such notice it cannot fairly be said that the special damages which the plaintiffs suffered because of their inability to fulfill their contract with the Quebec parties may reasonably be supposed to have been within the

contemplation of both parties at the time they made the contract upon which the present action is based. The complaint only alleged a notice given several months after such contract was made. It therefore failed to state facts to entitle the plaintiffs to recover the special damages resulting from the loss of their contract with the Quebec parties. Numerous cases to this effect are cited in Mr. Sedgwick's note to *Hadley v. Baxendale, supra.*

But with the above allegations there was also stricken from the complaint an allegation that at the time of making the contract the defendant had notice that the plaintiffs purchased the deals for shipment to and resale at Quebec. This is very different from the other allegation, that the defendant had notice on July 8th that the plaintiffs had already contracted for a resale, and, as we shall presently see, should not have been stricken out.

Testimony was offered by the plaintiffs on the trial to prove the allegations thus properly stricken from the complaint, but it was rejected by the court. It is an elementary rule that to entitle the plaintiff to prove special damages, in an action to recover damages, he must allege in his complaint the facts which entitle him thereto. No such facts as to a resale being alleged in this complaint, the testimony was properly rejected.

It was, however, alleged in the complaint (as already stated) that the deals were purchased for shipment to Quebec, and the undisputed evidence is that the defendant company had notice of the fact when the contract of February 5, 1878, was made. The evidence having been received, the plaintiffs are entitled to the benefit of it, the same as though the averment had been retained in the complaint. It may reasonably be presumed that when the contract was made the defendant knew that, should it fail to deliver the deals as agreed, the plaintiffs would be unable to procure them by the agreed time of delivery at Ashland, or in any other Lake Superior lumber market.

Whether the plaintiffs intended to sell the deals in the Que-

bec market or not, they purchased them for shipment to that market, and for some use there, and by any just rule they are entitled, under the peculiar circumstances of the case, to have the benefit of the market price there in the estimate of their damages.  We think it may reasonably be supposed that the parties contemplated this as a result of a breach of the defendant's agreement to deliver the deals.  The defendant company was cognizant of facts which make such presumption almost conclusive against it.  Hence, within the rule of *Hadley v. Baxendale*, the market price at Quebec of deals like those contracted for, at the times when in the usual course of transportation they could have reached there had both parties fulfilled their contract, say in August and September, 1878, is the true basis upon which the plaintiffs' damages should be assessed. From this value should be deducted the cost of transportation, including insurance, the fees for inspection, and any other expenses (if there were any) usual and necessary to put the deals upon the market.  The difference between that balance and the contract price is, we think, the proper measure of the plaintiffs' damages, as the case now stands.

This seems to us to be the correct application of the rule of *Hadley v. Baxendale* to the present case; and the application is sustained in principle by several of the cases above referred 'to.

The jury were instructed that they might consider the evidence of the market value of deals in Quebec, but " only so far as it may throw light upon the real state of the market at Ashland and vicinity." This was an improper restriction upon the effect of the evidence, which, when considered with other portions of the charge before mentioned, could scarcely fail to be injurious to the plaintiffs.  The jury should have been instructed that the evidence should be considered by them as determining the value of the deals to the plaintiffs at Ashland, the agreed place of delivery.

On behalf of the plaintiffs the following instruction was

prayed, but the court refused to give it: "If the jury believe lumber of the dimensions mentioned in the contract in evidence could not be obtained at Ashland, the place of delivery mentioned in said contract, by the plaintiffs, to be taken to the market at the time when the lumber was by said contract to have been delivered, then they may consider what was the then price of such lumber at Quebec, and the expense of transporting the same from Ashland to Quebec, together with the cost of inspection, and in that way ascertain the value of such lumber to the plaintiffs at Ashland, and the damages which the plaintiffs have sustained by the non-fulfillment of the contract."

Understanding that the cost of insurance is part of the expense of transportation (for that measures the perils of the transit, which is an element in the cost of transportation), we perceive no good reason why the instruction does not state correctly the law applicable to the case. We think that the substance of the instruction should have been given.

Because of the errors above indicated there must be a new trial.

*By the Court.*— The order appealed from is reversed, and the cause will be remanded with directions to the circuit court to set aside the verdict and award a new trial.