HOUSTON ICE & BREWING CO. v. TIEMER.

(Court of Civil Appeals of Texas. Galveston. June 9, 1911. Rehearing Denied Oct. 5, 1911.)

1. APPEAL AND ERROR (§ 1068*)—HARMLESS ERROR—INSTRUCTIONS.

In an action for the failure of the seller of brewers' grain to deliver according to contract, calling for 600 tons in a year, and monthly deliveries of 40 to 50 tons to begin December, 1906, and end December, 1907, where there was evidence that the contract was modified and deliveries on the first two months were waived, a charge that the contract was for the sale of 600 tons of brewers' grain, when taken in connection with a subsequent charge, which submitted to the jury whether the deliveries for the first two months were waived, or the time for performance altered to run from March 1, 1907, to March 1, 1908, and in view of the verdict, finding 195 tons shortage, less 10 per cent. of 500 tons, leaving a total of 145 tons, was not error.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 1068.*]

2. SALES (§ 418*)—REMEDY OF BUYER — ACTION—DAMAGES—GOODS INTENDED FOR RESALE.

Plaintiff purchased brewers' grain of defendant, intended for resale in a foreign country, delivery being made f. o. b. cars at defendant's residence for transportation. Defendant failed to deliver the full amount, and was the only one at that point having such grain for sale. The transportation from the nearest other market where this grain was obtainable to the country where plaintiff intended to resell the grains was less than the charges from the place of delivery to that country. *Held* that, the damages allowed in such cases being only compensatory, the plaintiff could not recover as damages the transportation charges for carrying the grain from the point where he covered the shortage to the original place of delivery, for the grain was not intended for use at that place, despite the rule that the measure of damages in such cases is the difference between the contract price and the market value of the article at the time when and place where it should have been delivered, in addition to

---

damages for the increased price he might have to pay at the nearest market.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174–1201; Dec. Dig. § 418.*]

**3. APPEAL AND ERROR (§ 1175*)—DETERMINATION—RENDITION OF JUDGMENT.**

Where, after the appellate court deducted an erroneous item of damages, a buyer's damages for the seller's refusal to deliver the goods sold were less than the amount found by the jury to be due the seller on the contract, and the seller did not in the appellate court request a judgment for the excess, the two amounts will offset one another, and judgment will be rendered that plaintiff take nothing.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 1175.*]

Error from District Court, Harris County; Norman G. Kittrell, Judge.

Action by Paul Tiemer against the Houston Ice & Brewing Company. There was judgment for plaintiff, and defendant brings error. Reversed and rendered.

Baker, Botts, Parker & Garwood, for plaintiff in error. Hume & Hume, for defendant in error.

McMEANS, J. The Houston Ice & Brewing Company, which will hereinafter be called the defendant, owns and operates a brewery at Houston, Tex. One of the by-products in the manufacture of beer is dried brewer's grains, a feed stuff. Paul Tiemer, who will hereinafter be called the plaintiff, and who does business under the name of Doherr, Grimm & Co., is a broker in New York City. A representative of the plaintiff called on Mr. Hamilton, who was president of the defendant, in New York on or about October 29, 1906, and, after having had a conversation with him about the purchase from defendant of dried brewer's grains, wrote the following letter: "New York, Oct. 29/06. The Houston Ice & Brewing Co., Houston, Texas—Gentlemen: Referring to our conversation with your Mr. Hammerston, we herewith acknowledge to have bought of you: 600 tons of prime, light colored, best dried brewer's grains, at $16 per ton, including the bags, f. o. b. cars Houston, Texas. Shipment to be made monthly, one shipment of 40 or 50 tons, beginning December, 1906, and ending with December, 1907. Payment cash against bill of lading by sight draft on us. We ask you kindly name us the best railroad rate you could procure for us. Goods to be delivered f. o. b. export steamer Galveston. Yours respectfully, Doherr, Grimm & Co." To this letter the defendant replied as follows: "Houston, Tex., Nov. 6, 1906. Gentlemen: Yours of October 29th received. Our sale to you of our brewer's grain, between forty and fifty tons per month, beginning January, 1907, is hereby confirmed, payment cash against bill of lading by sight draft on you. The railroad rate from Houston to steamer at Galveston is 5 cts. per. cwt., that is $1.00 per

short ton. We will send you at once a large sample by express prepaid. Yours truly, Houston Ice & Brewing Co." Following the letter of October 29th, the plaintiff on November 5th wrote a letter to the defendant about the freight arrangements, and, the defendant having replied to this under date of November 9th, the plaintiff wrote on November 13th as follows, which was the first letter written by him after the receipt of the defendant's letter of November 6th: "New York, Nov. 13, 1906. Gentlemen: We have your favor of the 9th inst. In regard to the contract between us, would say that we notice that you have changed shipment to January, whereas your Mr. Hamilton, while here, spoke about shipment in November. November shipment was changed to December shipment, and now you write about January shipment. We regret very much that this misunderstanding has occurred the very first time we do business with you. We have sold November shipment as first verbally agreed between us, and we therefore are very desirous and hope you will see your way clear to start same in December, so as not to disappoint us. Please remember that each monthly shipment must be made in one lot. Regarding freight rate, we would be pleased if you will handle same for us. We suppose the December shipment will have to be shipped at the best possible rate, but we hope you will be able to get for us a rate even lower than 22 cents per 100 lbs. after the first of January, We are advised by freight agents that freight would be considerably lower if the grain would be put more firmly into the bags, that is, pushed down so as to be less bulky. Kindly go into this and let us know what can be done. Yours very truly, Doherr, Grimm & Co." It is out of the contract evidenced by these three letters that this suit arose; the plaintiff claiming that the defendant had not delivered all of the grains called for by the contract, and the defendant claiming that it had. There was a verdict and judgment in favor of the plaintiff for $1,105.40, from which judgment the defendant appealed.

[1] Defendant's first assignment of error is as follows: "The court erred in the second paragraph of its charge, which is as follows: 'It is the duty of the court to construe the contract and give to you its meaning, as such contract is constituted by the letter of October 29, 1906, from the plaintiff to the defendant, and the reply thereto of November 6, 1906, by the defendant to the plaintiff. In pursuance of that duty, the court instructs you as a matter of law that the contract was on the part of the defendant to deliver to the plaintiff within a certain limit of time (concerning which question you will be instructed hereafter, in paragraphs 3 and 7 of this charge) 600 tons of prime, light colored, best dried brewer's grain, at either

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

$15 or $16 per ton (according as you may find under the instructions herein given you in paragraph 4 of this charge), including bags, free on board cars at Houston.'" Under this assignment defendant urges the following proposition: "The defendant contended on the trial below that the modification of the contract made by agreement subsequently, and which we shall refer to in the statement below, operated to relieve it of the obligation to deliver the shipments due in January and February, 1907; in other words, canceled 'the contract as to them; and the plaintiff contended, on the other hand, that this modification operated only to change the date at which the deliveries were to begin, the number of deliveries to be the same. Assuming for the present that the latter construction is correct, a delivery of 40 tons per month, beginning March, 1907, and ending March, 1908, or 520 tons in all, would have been a complete performance by the defendant of its contract, and the charge of the court that it was obligated to deliver 600 tons was erroneous."

The modification of the original agreement which defendant contends was made by the parties is evidenced by the following correspondence between them:

"Houston, Texas, Dec. 27, 1906. Messrs. Doherr, Grimm & Co., New York, N. Y.— 'Gentlemen: Referring to our contract for brewer's grain: When our president, Mr. Hamilton, first took up the matter with you, and sold you the grain, he understood nothing but a 2,000-lb. ton, because nothing else is known to us here. There is no merchandise that we buy or sell on any basis other than 2,000-lbs. ton. However, recognizing that you had figured on a long ton, we telegraphed you, stating that we agreed to the long ton to govern our contract with you. This is quite a concession on our part now, and we want you to reciprocate our concession to you by permitting our contract with you to be operative from the 1st of March instead of the last of January. The reason we are compelled to ask this modification of the contract with you is, that while Mr. Hamilton was in New York, the writer sold the grains to a Galveston brokerage firm, covering our out-put until February 28th. When sale was made to the Galveston firm, the writer telegraphed to Mr. Hamilton about it, to New York, but the wire failed to reach him, and thus a duplicate sale of our grains occurred. It is, of course, impossible for us to fill but one contract. We have tried to get the Galveston people to release us of their contract, but they are unwilling so to do; therefore nothing remains but to ask you to release us until February 28th, when we will begin shipment to you. Yours truly, Houston Ice & Brewing Co., per R. L. Autry, Sec'y. and Treas."

"New York, Jan. 2, 1907. Gentlemen: Yours of the 27th to hand, contents carefully noted. We note that you wish to begin shipment on March 1st., '07. You have disappointed us several times from the very start of our connection with you, by not making shipments as agreed, and we wish to impress upon you the fact that we are not used to such treatment. However, we will accept your proposition to start shipments on March 1st, 1907, because we are bound to live up to our contract with our friends abroad. Yours truly, Doherr, Grimm & Co."

The defendant shipped approximately 305 tons. The verdict of the jury is, in part, as follows: "We, the jury, find the extent of damages sustained by the plaintiff under the instructions of the court to be as follows: The shortage in amount of deliveries 195 tons, less 10 per cent. of 500 tons, 50 tons, leaving 145 tons." It is thus seen that the jury accepted the defendant's construction that the modification had the effect to eliminate the first two months. The court in the third paragraph of the charge instructed the jury that the time of the beginning of the delivery had by agreement been extended to March 1, 1907, and submitted to them the question whether the effect of the agreement was to project or extend the time of the completion of the contract up to March 1, 1908, as contended by plaintiff, or whether defendant was only bound to deliver up to the end of December, 1907, as contended by defendant, in which event the jury were instructed that such grain as was produced by defendant or that it had for shipment in January and February, 1908, it would not be under obligations to deliver. By the seventh paragraph of the charge the court instructed the jury as follows: "If you find that it was the intention of the parties by the agreement to extend the time of the beginning of delivery to March 1, 1907, that the contract should end with the month of December, 1907, then for such amount not to exceed 50 tons, nor less than 40 tons, that the defendant could have delivered in the months of January and February, 1908, you will not allow any damages, but, if you believe that it was intended by the agreement between the parties to project and extend the time of delivery over into 1908 until the 1st of March, then in calculating the damages, if any you find, you will count in such deliveries as should have been made under the contract in the months of January and February, 1908." Taking the entire charge and construing all its parts together, we think there was no error in the paragraph complained of and the assignment raising the point, and all propositions presented thereunder are overruled.

[2] The following paragraph of the charge is assailed by defendant's second assignment of error: Having ascertained this fact, you will allow the plaintiff as damages the difference between $15 or $16 per ton (according as you may find upon that point), and what you find from all the testimony it would have cost him to purchase the article or

product in the nearest market, which is shown to have been St. Louis, Mo., and to have delivered it free on board cars in Houston, ready for shipment to Galveston, together with interest on that difference at 6 per cent. per annum from either December 31, 1907, or March 1, 1908, according as you may find on the question of time of delivery, under the instructions given you in paragraph 4 of this charge."

Under this assignment defendant urges the following propositions:

"First. The measure of damages for the breach of a contract to deliver goods at a certain place, which have, in turn, been sold by the purchaser for delivery at another place, does not include the entire cost of delivering them from the most available market to the place at which they should have been delivered, when this cost, plus the cost of delivering them from that point to the place to which they have been resold, exceeds the cost of delivering them to this place from the most available market.

"Second. The goods having been purchased in Houston to fill sales made in Europe, and there being no market in Houston, the measure of damages did not include all of the freight from St. Louis to Houston, where the evidence showed that this freight was in excess of the difference between the freight from St. Louis to European points, and from Houston to European points."

We think the evidence justifies the conclusion that the grain contracted for had been sold by the plaintiff abroad, to be delivered by him to the foreign purchasers at or through Antwerp, Belgium. The contract especially provided that the grain should be delivered to plaintiff free on board the cars at Houston, Tex. It was further conclusively shown that the only dried brewer's grains produced at Houston was that produced by the defendant as a by-product of its brewery, that there was no market at Houston for such grains, and that the markets in the United States for the purchase and sale of such grains are New York, Chicago, Milwaukee, and St. Louis, the latter city being the nearest market for such products to the city of Houston. It was further shown by the undisputed testimony that the rate of freight on dried brewer's grains from St. Louis to European points, such as Antwerp, was lower in the fall of 1907 and winter of 1908 than from Houston, Galveston, or New Orleans to the same points. The jury found by their verdict and allowed plaintiff $2 per ton difference in the price of the grains between St. Louis and Houston, and also allowed plaintiff $6.84 per ton, being the rate of freight from St. Louis to Houston. This last allowance was made, no doubt, on the assumption that, as defendant had contracted to deliver the grains at Houston, the plaintiff, after defendant had breached its contract, would be entitled to such a sum in the way of damages as would be necessary for it to have placed the grains at the point where, under the contract, they were to be delivered to him. This view was warranted by the charge complained of. It has been stated to be the general rule that, "when contracts for the sale of chattels are broken by the vendor failing to deliver the property according to the terms of the bargain, it seems to be well settled, as a general rule, both in England and the United States, that the measure of damages is the difference between the contract price and the market value of the article at the time when and place where it should have been delivered, with interest." Sedgwick on Damages, § 734.

The basis of this rule is that, on failure of the vendor to deliver, the purchaser may go into the market at the time and place of delivery, and supply himself with the same kind of goods at the market price. Hence this difference between what he is compelled to pay for the goods, and what they would have cost him had the vendor performed his contract, justly measures the damages which he has sustained by the breach of the contract. Cockburn v. Ashland Lumber Co., 54 Wis. 619, 12 N. W. 49. This rule has special application in cases where the goods are to be used by the purchaser at the place of delivery, or not intended for shipment or resale. For example, if the plaintiff intended to use the grains for feed at Houston, the place of delivery, then the damages he sustained by defendant's breach would be the difference in the contract price of the grains and the price he was compelled to pay at the time and place of the breach. And, if at the time of the breach the grains of the quality sold could not be bought by the plaintiff in Houston, then the plaintiff would be authorized to enter the nearest market, purchase the grains, and ship them to the agreed place of delivery, and hold the plaintiff for the difference in the market price plus the cost of transportation to the place of delivery. But this rule has no application where the goods were purchased for resale, and where there is no market at the place of delivery which the purchaser may enter and buy the quantity and quality of goods which the seller has failed to deliver to him. In such case he may go into the market nearest the agreed place of delivery, purchase the goods, and hold the seller for the difference between the contract price and the price he was compelled to pay, adding thereto the difference between the cost of transportation from the place of purchase to the place of resale over the cost of transportation from the place of delivery to the place of resale. This rule is not only reasonable, but is in consonance with justice. This may be demonstrated by directly applying the rule to the facts in this case. Defendant, as found by the jury, failed to deliver 145 tons of the grains which it had bound itself to deliver. Had there been a market in

Houston for such commodity, plaintiff could have purchased the 145 tons at that place and at the time of defendant's breach, and could have held defendant for the difference between the contract price and the price he had to pay. This would have fully compensated him for any loss he may have sustained by the breach. But there being no market in Houston, and the goods having been bought for resale, the buyer had the right to purchase at the nearest market sufficient grains to supply the deficiency caused by defendant's breach, and charge the difference in price as well as the difference in the cost of transportation, if any, to defendant; and this would have compensated him for any damages caused him by defendant's default. Damages are allowed in cases of this kind only as compensation, and, when a party has been compensated for any damages caused by a breach of a contract, then the purpose of the law has been attained. The grains were not, so far as the records show, purchased by plaintiff in St. Louis. nor were they, as a fact, shipped from St. Louis to Houston, and, if they were in fact purchased at St. Louis, there was no necessity for shipping them to Houston, and to allow plaintiff a recovery for the cost of transporting them from one place to the other would have the effect of compensating him for damages he had never sustained. As before stated, the cost of transportation from St. Louis to Antwerp and other European points was less than from Houston, and the cost of transportation was a matter that did not enter into the contract of sale; so it is clear that plaintiff sustained no damages by reason of having to pay the cost of transportation from St. Louis to Antwerp, if he did, in fact, pay such costs. See note to Guetzkow Co. v. Andrews, 52 L. R. A. 219, 222; Vogt v. Schienbeck, 122 Wis. 491, 100 N. W. 820, 67 L. R. A. 756, 106 Am. St. Rep. 989; Lumber Co. v. Bradlee, 96 Ky. 494, 29 S. W. 313; Cockburn v. Lumber Co., supra. The assignment is sustained.

By its third assignment of error defendant complains of the refusal of the court to give to the jury its sixth special charge, which reads as follows: "If you believe from the evidence that at the time or times the defendant failed to make deliveries of brewer's grains under its contract, if you find it did fail, the freight rate from St. Louis, Mo., to the point or points in Europe to which the plaintiff had contracted to sell said grains, if you find he had so contracted, was the same or less than the freight rate from Houston to the same points in Europe, and if you believe there was at the time or times no market for said grains in Houston, then you are charged that the measure of the plaintiff's damages, if any he has sustained on account of said deliveries, if any, is the difference, if any, between the contract price and the market value of said commodity at St. Louis at said time or times, with interest on said difference from said dates at 6 per cent. per annum." We think this charge states the law as applied to the facts of this case, and that it should have been given in lieu of the charge on the measure of damages given by the court hereinbefore discussed. The assignment is sustained.

[3] The jury found that defendant had failed to deliver to plaintiff 145 tons of grains as it was bound by the contract to do, and found that the difference between the contract price and the value of the grains at St. Louis, the market nearest Houston, was $2 per ton, aggregating $290. Defendant alleged, the proof established, and the jury found that plaintiff was indebted to defendant in the sum of $305, being the balance due upon grains which had been delivered on the contract, and the jury allowed defendant a credit for that amount. This more than offset the difference in the value of the grains which defendant had failed to deliver. As the plaintiff, under the facts of this case, was not entitled to recover the freight charges from St. Louis to Houston, and as defendant has not asked in this court for judgment over against plaintiff for the excess in its favor, the effect of the verdict is to cancel the amount due by plaintiff to the defendant for the breach by the balance due by plaintiff to defendant for grains delivered on the contract. We think, therefore, that the judgment in favor of plaintiff should be reversed and judgment be here rendered that plaintiff take nothing by his suit, and it has been so ordered.

Reversed and rendered.