BIRDSONG & COMPANY, INC., Respondent, vs. MARTY, Appellant.

*May 5—June 13, 1916.*

*Sales: Contract by letters, etc.: Construction: "Minimum car:" Breach by seller: Measure of damages: "Market price."*

1. Letters and telegrams which passed between the parties are *held* to have constituted an unqualified contract for the sale by defendant to plaintiff of certain quantities of cheese at specified prices, and not a mere brokerage contract.
2. The term "minimum car" in a contract for the sale of goods to be shipped by rail refers to the smallest amount which will take the carload rate.
3. Where the contract was for the sale of twenty-five tubs (19,375 pounds) of one grade of cheese and enough of another grade "to make minimum car," and it appeared that 20,000 pounds of cheese constituted a minimum car, the buyer was entitled to receive one tub (775 pounds) of the second grade, it not being shown to be usual or practicable to ship a part of a tub.
4. Where title has not passed and the seller wrongfully neglects or refuses to deliver the goods, the measure of damages prescribed in sub. 3, sec. 1684t—67, Stats., can be applied only when there is an available market for the goods; otherwise, the measure of damages is that fixed by sub. 2 of said section.
5. Market price is the price at which goods are actually being sold

in the market at the time or times in question; and there cannot be a real market price for a commodity when there is no such commodity for sale in the market.

6. Where, upon the seller's refusal to deliver goods, the buyer was obliged to buy other goods at a higher price to fulfil his own contracts of resale, the measure of his damages, under sub. 2, sec. 1684*t*—67, was the difference between the original contract price and the price he was obliged to pay.

APPEAL from a judgment of the circuit court for Rock county: GEORGE GRIMM, Circuit Judge. *Modified and affirmed.*

Action for damages for breach of contract. Plaintiff is a corporation engaged principally in the business of buying and selling cheese and other edible products, with its principal office at Philadelphia. The defendant is a maker and dealer in cheese, doing business as Jacob Marty & Company at Brodhead, Wisconsin. On July 14, 1914, plaintiff wrote the defendant a trade letter, which, among other things, contained the following statements:

"We wish to advise you that Mr. O. G. Loeliger, formerly of New York, has taken charge of our cheese department which we are just opening up and write to ask you whether you cannot work with us in Philadelphia on a consignment basis, letting us have shipment of cheese, we to carry same and sell to our buyers as they may desire. . . . And also let us know just what commission you can allow us for handling these goods and what arrangements you desire to make."

On July 16, 1914, the defendant replied, acknowledging receipt of the letter of the 14th, stating that he knew Mr. Loeliger, and continuing as follows:

"We do not wish to make any shipments on consignment, as we always have more or less trouble with this kind of business. We would be glad to send you quotations from week to week, and if you can dispose of any of our goods at the prices we make you, we will be glad to fill any orders you may send us. Of course we would be glad to have you send us orders direct from Pennsylvania, Maryland and New Jersey, and we would fill same direct to the trade at ¼c. commission."

Defendant then quoted prices and description of goods and closed with the following statement: "These above mentioned prices are all f. o. b. here, and we hope to receive some nice orders."

On August 3d plaintiff sent to the defendant an order for two tubs of Round Swiss No. 1, to be shipped to a specified customer in Philadelphia. On August 5th the defendant declined to accept the order on the ground that the party named was not a good credit risk. August 4th the plaintiff telegraphed the defendant as follows: "Can handle twenty-five tubs fancy open ripe Swiss sixteen wire." Later in the day of August 4th plaintiff telegraphed defendant: "Wire lowest price twenty-five tubs Round Swiss Number One ripe." On August 4th, in reply to plaintiff's telegram, defendant telegraphed plaintiff: "Sixteen one-half for twenty-five fancy open Swiss. Wire acceptance." On the same day the plaintiff wired defendant as follows: "Accept twenty-five tubs fancy open ripe Swiss sixteen one-half. Ship immediately." On August 5th plaintiff wrote defendant confirming telegraphic order as follows: "We wired you last evening as per inclosed copy, accepting 25 tubs of fancy open ripe Swiss at 16½c. for immediate shipment and trust you will get these off to us as promptly as possible and of your usual good quality." On the same date defendant wrote plaintiff confirming transaction had by telegraph as follows: "We have your wire stating that you accept the twenty-five tubs at 16½c. for immediate shipment and we will do our best to get this order off as soon as possible. You may have to wait perhaps a week before we ship same, as we are just getting in the June Swiss, a few tubs from different factories, but as stated before we will send them along as soon as possible."

On August 5th plaintiff telegraphed defendant as follows: "Increase our order to minimum car as your yesterday's message." In response to which message defendant telegraphed as follows: "Sold out at present with fancy Swiss. Offer you good sound number two at thirteen to make minimum car."

Replying to this plaintiff telegraphed defendant on the same date: "Complete minimum car with twos per your wire. Rush." On August 6th plaintiff wrote defendant as follows: "We confirm our telegram to you as per inclosed copy and re-gret that you could not furnish further quantities of fancy goods from you, but to complete car with twenty-five tubs we have already ordered from you, we would ask you to ship the number twos at 13c. to make minimum car." On August 7th defendant wrote plaintiff as follows: "We have your wire of the 6th inst., which reads as follows: 'Complete minimum car with twos per your wire. Rush.' In regard to this wire, will say that we will book you for enough No. ·2 Swiss to make out a minimum car." On the same date plaintiff wrote defendant: "We acknowledge receipt of your favor of August 5th, and would ask you to kindly rush shipment of cheese as we are in need of same," and giving other directions not material here.

On August 17, 1914, plaintiff telegraphed defendant: "Have you shipped car, if not ship immediately, buyers anx-ious." They followed this telegram with a letter on Au-gust 17th: "We have wired you today as per inclosed copy inasmuch as we have had no invoice or bill of lading from you on cheese purchased. Our buyers are getting very anxious for same, and if you have not already shipped kindly give this your immediate attention and get same off at once."

On August 17th, and apparently in response to the tele-gram of that date from the plaintiff, defendant wrote plaint-iff as follows:

"In regard to order for Swiss cheese which you sent us, will say that we will be unable to take care of this order, as it is impossible for us to get the goods. When you sent this order in we bought the goods from the company factories in this vicinity, but when the time came to deliver the cheese they would not send it in and are holding all of the Swiss for a higher price. All of the dealers are canceling orders on this account.

"We regret very much in having to cancel this order, but as

mentioned above we cannot make shipment when we cannot buy the cheese."

The defendant's letter of August 17th was received by plaintiff on August 19th. Upon receipt thereof plaintiff telegraphed defendant as follows:

·"Letter received. Will not accept your cancellation. Have sold cheese our buyers' strength your confirmation buyers insisting deliveries we must insist upon you shipping car immediately in order save expensive claims against you for nondelivery we advise you work quick make immediate shipment answer when will car go forward."

On the same date plaintiff wrote defendant to substantially the same effect. On August 26th and 27th plaintiff wrote and telegraphed defendant insisting upon delivery. To these letters and telegrams the plaintiff received no reply until September 8th, when defendant wrote plaintiff as follows:

"In answer to your telegram and several letters, wish to advise that we have finally made settlement with the farmers with whom we had bargained for about three hundred tubs of June Swiss about the time the war in Europe broke out. At the time the war started dealers from the East and from New York came through this section and paid as high as 18c. and 20c. This caused the farmers with whom we had dealings to back out on us. Now we have several factories ourselves which are paid on a company basis, and therefore at the time it was impossible for us to deliver the goods to you."

This letter contained some other suggestions and statements in regard to the controversy between the parties, which are not material here.

By letter dated September 11, 1914, plaintiff made demand upon the defendant for settlement under the contract in accordance with the following statement:

1 carload Swiss cheese, 60 tubs.

| | | | | | |
|---|---|---|---|---|---|
| No. 1 | 25 tubs at 650 lbs. each | 16,250 | 3½c. | $568 | 75 |
| No. 2 | 35 tubs at 650 lbs. each | 22,750 | 4c. | 910 | 00 |
| As we'bought only 10 tubs at 20c. we have to buy 15 tubs more at 23c. | | | | | |
| | 15 tubs at 650 lbs. | 9,750 | 3c. | 292 | 50 |
| | | | | $1,771 | 25 |

Defendant declined to make an adjustment, with the result that plaintiff brought this action to enforce its claim for damages. The case was tried before the court without a jury. The trial court held that the correspondence constituted an unqualified contract of purchase and sale, by which the plaintiff purchased of the defendant twenty-five tubs of No. 1 cheese at $16\frac{1}{2}$ cents a pound, and a sufficient amount of No. 2 at 13 cents to make a minimum carload; that a minimum east-bound car contains 20,000 pounds; that the average weight of a tub of Swiss cheese in August is approximately 775 pounds, and that the contract therefore called for 19,375 pounds of No. 1 and 625 pounds of No. 2; that at Brodhead and in southern Wisconsin generally the market price on August 17 was $17\frac{1}{2}$ cents to 18 cents for No. 1 and $15\frac{1}{2}$ cents for No. 2; that at the time plaintiff received defendant's letter canceling the contract the price had advanced to 20 cents for No. 1 and $16\frac{1}{2}$ cents for No. 2; and plaintiff had judgment accordingly for $700. From such judgment defendant appeals.

*E. D. McGowan,* for the appellant.

For the respondent there was a brief by *Jeffris, Mouat, Oestreich & Avery,* and oral argument by *L. A. Avery.*

ROSENBERRY, J. The defendant claims that the relation between the plaintiff and the defendant was that of principal and broker and not that of buyer and seller; that under all the facts and circumstances plaintiff was in good faith bound to advise the defendant of the changed condition of the market due to the declaration of war in Europe; that there was no contract between the parties for the purchase and sale of the cheese; that the date as of which the damages should be determined is August 17th, the day on which the defendant wrote the letter canceling plaintiff's order, and not August 19th, the day on which the letter was received by plaintiff.

Plaintiff excepted to the finding of the court as to the amount of damages and asked for a review and modification

of the judgment under the provisions of ch. 219, Laws 1915 (sec. 3049*a*, Stats. 1915).

We think the trial court was right in finding that the relation which existed between the plaintiff and the defendant was that of buyer and seller and not that of principal and broker. Defendant's letter of July 16th seems to set this question absolutely at rest. Defendant says: "We do not wish to make any shipments on consignment, as we always have more or less trouble with this kind of business." But even if this were not true, the transaction between the plaintiff and the defendant, commencing with the telegram of the plaintiff dated August 3d and closing with defendant's letter of August 7th, constituted a contract for the sale and purchase of goods as found by the court. The defendant breached his contract under a mistaken idea that he had a right to do so for the reason that "so long as you pay no money down on any contract the contract is not lawful."

The only question remaining is that relating to the measure of damages. The defendant having refused to deliver the goods and the title thereto not having passed to the plaintiff, the measure of damages, in harmony with the decisions of this court, is stated by the Uniform Sales Act as follows:

"Section 1684*t*—67. 1. Where the property in the goods has not passed to the buyer, and the seller wrongfully neglects or refuses to deliver the goods, the buyer may maintain an action against the seller for damages for nondelivery.

"2. The measure of damages is the loss directly and naturally resulting in the ordinary course of events, from the seller's breach of contract.

"3. Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver."

The court found the market price on August 19th, the day the plaintiff received the defendant's letter in which the de-

fendant stated that he would not deliver the goods, to be for No. 1 cheese 20 cents a pound, and for No. 2 16½ cents a pound, and found that the amount designated in the telegram was twenty-five tubs of No. 1 and just enough No. 2 to make 20,000 pounds. This would require the shipment of a part of a tub, which is not shown to be usual or practicable. Plaintiff claims that it was entitled to receive twenty-five tubs of No. 1 and five tubs of No. 2, basing the claim upon the statement made by the defendant at the trial that that was what he would have shipped had he filled the order. ·

Defendant's proposition was: "Offer you good sound number two at thirteen to make minimum car." To which plaintiff replied: "Complete minimum car with twos per your wire." The term "minimum car" refers to the smallest amount of the specified article which will take the carload rate, and is shown in this case to be 20,000 pounds on cheese east bound. Under the terms of this contract we think that plaintiff would not have been required to accept more than' the amount stated. Plaintiff therefore was entitled to receive 19,375 pounds of No. 1 and one tub of No. 2 to make out a carload lot, or 775 pounds of No. 2.

While the trial court found the market price, it appears from all the evidence without dispute that there was in fact no market for cheese in or about Brodhead, the place of delivery, or in or near southern Wisconsin, in the latter part of August, 1914. The defendant himself testified:

"On account of the war you know we simply had no market price through our section in the Swiss cheese." "The farmers got hold of theirs and they would not sell at any price, and some that had sold it backed out on it." "We could not get any what we had bought." "For ten days or two weeks you could not get it at any price, no matter what you offered."

Another witness testified: "There wasn't practically any market there. It was in such a fluctuating state," and the testimony of all of the other witnesses is substantially to the same effect. There was some evidence as to deliveries made during the latter part of the month, mostly on orders taken

earlier, but a careful examination of the evidence shows that there was no market at the time and hence there could be no market price. Market price is not an imaginary, fictitious thing, but is the price at which goods are actually being sold in the market at the time or times in question.

The burden was upon the plaintiff to establish the amount of its damages. This it did by showing that there was no available market in which the cheese could be purchased and that it was obliged to pay for 6,500 pounds of No. 1 cheese 20 cents a pound, and for 12,875 pounds of No. 1 cheese 23 cents a pound, in order to fill contracts which it had made with its customers. This made a *prima facie* case for the plaintiff. If the damages could have been minimized by purchase of the cheese in the open market, the burden was then upon the defendant to show that there was such an available market in which the goods could have been purchased. As has been said by this court, "The idea that there can be a real, substantial market price for a given commodity, when there is no such commodity for sale in the market, is absurd." *Cockburn v. Ashland L. Co.* 54 Wis. 619, 12 N. W. 49. The defendant in this case made no such showing, and, as has been pointed out, it was, on the contrary, established that no market existed.

The trial court therefore was in error in assessing the damages at the difference between the contract price and the so-called market price. The rule stated in sub. 3, sec. 1684*t*—67, Stats., can only be applied under the conditions therein prescribed. In other cases where the property in the goods has not passed to the buyer, and the seller refuses to deliver the goods, the rule laid down in sub. 2 establishes the measure of damages, which is the loss directly and naturally resulting in the ordinary course of events, from the seller's breach of the contract. *Cockburn v. Ashland L. Co., supra; Foss v. Heineman,* 144 Wis. 146, 128 N. W. 881.

The evidence in this case shows that the plaintiff purchased 6,500 pounds of No. 1 cheese at 20 cents, and was

obliged to pay for the remainder, 12,875 pounds, 23 cents a pound, and that the lowest price quoted for 775 pounds of No. 2 was 17 cents a pound. It does not clearly appear whether plaintiff purchased the 775 pounds at that price or not, but he might have done so. On this basis the plaintiff was entitled to judgment for the sum of $1,095.37, with interest from August 19, 1914.

*By the Court.*—The judgment appealed from should be modified as stated in the opinion, and as so modified it is affirmed with costs to the respondent.